# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. JIMMY R. GRIFFIN

**Appeal from the Circuit Court for Madison County**
**No. 13-23    Donald H. Allen, Judge**

---

**No. W2013-01774-CCA-R3-CD  - Filed May 20, 2014**

---

The defendant, Jimmy R. Griffin, appeals his Madison County Circuit Court conviction of theft of property valued at more than $1,000 but less than $10,000, challenging the sentence imposed by the trial court. We affirm the denial of alternative sentencing but remand the case for a determination of the proper amount of restitution.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, J., filed a separate opinion concurring in part and dissenting in part.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Jimmy R. Griffin.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jerry Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 5, 2013, the petitioner entered a plea of guilty to theft of property, and, pursuant to the agreement reached by the parties, the trial court conducted a bench trial to determine the value of the property for purposes of establishing the grade of the theft offense. The prosecutor provided the following factual summary of the offense:

Barbara Ma[]ners is actually the owner of the property, she and

he[r] husband.[1]   The brother-in-law, Paul Ma[]ners, . . . was riding an ATV down the road when he saw two vehicles pulling out of the driveway of 53 Whittington Road. . . .  He stated that after that he went back and looked and discovered there was some metal piping and some other metal conduit and some other metal products that were located on that property that were then missing.  The sheriff's department got the tag number [that was recorded by Paul Maners] and located the owner of that and also went to various recycling places and ultimately went to Dudley's Recycling and found that those same products as identified by the victim were found at Dudley's Recycling.  There were tickets made out to both Bose Walker and Jimmy Griffin where they had turned in those electrical pipes.  I believe there was a metal box and other electrical fittings and other products taken to Dudley's and they received money for those metal things once they were turned into Dudley's.  Later . . . Mr. Walker gave a statement . . . admitting that . . . he along with his girlfriend's brother who is Jimmy Griffin . . . did go to that area of Whittington Road . . . .  He said that they got some metal pipe that was on the ground where the tree line was on the property.  They also got what he described as a big green job box full of metal fittings.  . . .  [T]hat they did take that property to Dudley's Recycling and received money for that and admitted that they did split the money that the[y] received from Dudley's 50/50.

Barbara Maners testified that she and her husband owned 113 acres of property on Whittington Road and that on August 20, 2012, her brother-in-law, Paul Maners, telephoned her and told her he had observed two vehicles leaving the area of "our material shop there, my husband's electrical company."  He also told her that the individuals had taken "pipe and other materials."  She said that after they closed their company, she and her husband continued to store materials in "two large bays about 60 f[ee]t in length" and on "a 60 foot pipe rack."  She said there were no doors to the "huge big bays," but they were located in a "very isolated" area that could not be seen from the road.  Ms. Maners testified that she and her husband realized that "things were disappearing" in the months preceding the offense but that they "could not catch anyone at it."  On August 20, 2012, however, she

---

[1]The transcript spells Ms. Maners' surname as "Mayners," but the indictment and the victim impact statement prepared by Ms. Maners spell the surname "Maners."  We will honor the spelling provided by Ms. Maners and used in the indictment.

was certain that thieves had taken "a gang box, a very large metal toolbox" and all the material inside it, including "commercial material for like set screw connectors, couplings." She said they also took "[c]onduit, pipe fittings, and other things like that." Ms. Maners testified that the box and its contents were returned to them by the recycling company but that they did not get the conduit or pipe fittings back.

Ms. Maners said that she and her husband compiled a list of the materials taken and the value of those materials. She acknowledged, however, that she could not be certain whether all of the materials on that list were taken by the defendant and co-defendant on August 20, 2012. She said she knew "for certain that the material that we got returned to us that day from the salvage yard" was taken by the defendant and the co-defendant. That was "commercial material and a gang box" that they valued "at over $6500." She said they received $5929.22 in materials back from the recycling company. Ms. Maners testified that they arrived at the value for the materials using the same computer program that they used to price the items when performing "a commercial job." She said that the materials "would have been purchased within the year." Ms. Maners testified that the total value of all the materials taken from their property between the time they closed their business and the date of the offense was $105,045.58. She said that total "would have to include the months before." She said that the only way to determine with certainty what was taken on August 20 would be to determine what was "sold at the scrap metal places."

During cross-examination, Ms. Maners acknowledged that she initially told the authorities that $700 worth of pipe and $50 worth of conduit had been taken. She said that that value was the result of her misunderstanding of the materials. She said that it would have been impossible for all of the items that totaled greater than $100,000 to have been taken in a single trip but that the items recovered from the recycling company could have been taken in a single load in a regular pickup truck.

Linda Long, manager at Dudley's Recycling, testified that the defendant and co-defendant sold items to Dudley's on August 20, 2012. The three merchandise tickets, two of which bore the defendant's name, listed the items sold and the value given. One receipt listed "about 1400 pounds of tin. That would have been including the gang box." Ms. Long specifically recalled the box being brought to Dudley's in a small pickup truck. She said that when she saw the box, she told employees "to put that to the side because [she] had a feeling it was stole[n]." She recalled that the truck also carried "a few pieces of pipe sticking out of it. It wasn't many in the truck and then the car had a little bit of tin and maybe a pipe or two. It wasn't much." Ms. Long said that she could only "remember seeing about three or four pieces of the pipe." She testified that she had examined her records, and only those three she produced in court bore the names of the defendant or co-defendant. She said that Dudley's returned the gang box to Ms. Maners. She recalled that there were "no more than six pieces

-3-

of pipe" not returned. She said the pipe was not returned because it had been cut before she realized that the items had been stolen. The total amount of money received by the defendant and co-defendant for the items was $132.80.

Madison County Sheriff's Department Lieutenant William Carneal testified that he responded to Paul Maners' 9-1-1 call and immediately began trying to locate the vehicles described by Mr. Maners and the property taken. He said that he found some property at Dudley's Recycling but did not find any of the property at any of the other scrap yards in the area.

Based upon this proof, the trial court determined the value of the property taken to be greater than $1,000 but less than $10,000. Accordingly, it convicted the defendant of a Class D felony. *See* T.C.A. § 39-14-105(3).

At the sentencing hearing, which was conducted in two parts, Ms. Maners asked the court to grant her $10,000 in restitution for the items taken that were not returned by Dudley's Recycling. The presentence report, which was exhibited to the hearing, showed that the defendant had no criminal convictions as an adult but that he had juvenile adjudications for vandalism, domestic assault, disorderly conduct, assault, reckless endangerment, aggravated burglary, theft, possession of stolen property, possession of drug paraphernalia, and unauthorized use of a motor vehicle.

In arriving at the four-year sentence, the trial court applied enhancement factors for the defendant's previous failure to comply with a sentence involving release into the community and for the defendant's juvenile adjudications for offenses that would have been felonies if committed by an adult. In mitigation, the court considered the defendant's youth, that his conduct did not cause or threaten serious bodily injury, that he cooperated with the investigation, that he took responsibility for his actions by pleading guilty, and that he had maintained steady, gainful employment. The court gave "great weight" to the enhancement factors, particularly the defendant's extensive juvenile record.

The court also ordered the defendant to pay $5,000 restitution based solely on the testimony of Ms. Maners.

The trial court denied all forms of alternative sentencing based upon the defendant's failure to avail himself of "numerous opportunities at rehabilitation" offered to him while a juvenile offender. The court also noted particularly the defendant's failure to comply with probationary sentences while a juvenile. Based upon these failures, the court concluded that the defendant lacked the potential for rehabilitation and that measures less restrictive than confinement had been applied without success. The court also determined

that a fully incarcerative sentence was necessary to protect society from the defendant, who likely would not "have stopped committing this theft had [he] not been caught in the act."

In this timely-filed appeal, the defendant contends that the trial court erred by imposing a fully incarcerative, four-year sentence.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

The supreme court expanded the holding in *Bise* to the trial court's decision regarding alternative sentencing and probation eligibility in *State v. Caudle*, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

In our view, the record supports the sentencing decision of the trial court. The trial court considered the principles of sentencing as well as several enhancement and mitigating factors in arriving at the decision to impose a four-year sentence. The court gave great weight to the 20-year-old defendant's lengthy record of juvenile convictions and previous failures to comply with sentences involving release into the community. The record supports the court's determination that a sentence of full confinement was necessary because measures less restrictive than confinement had frequently and recently been applied without

success. *See* T.C.A. § 40-35-103(1)(C). The defendant garnered his first juvenile adjudication at age 12 and accumulated seven more adjudications within the ensuing five years, the last occurring just before his 17th birthday. Some of the adjudications were for offenses committed while the defendant was on probation. He then committed the offense in this case just before his 20th birthday.

Although not raised by the parties, we observe plain error in the restitution order. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). The trial court set the amount of restitution to be paid as $5,000 without determining the precise value of the property taken or taking into consideration the value of the property that was restored to the victims.

"As a general rule, courts exercising criminal jurisdiction are without inherent power or authority to order payment of restitution except as is derived from legislative enactment." *State v. Alford*, 970 S.W.2d 944, 945 (Tenn. 1998). Tennessee Code Annotated section 40-20-116 provides:

> Whenever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another of property, the jury shall ascertain the value of the property, *if not previously restored to the owner*, and the court shall, thereupon, order the restitution of the property, and, in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner, for which execution may issue as in other cases.

T.C.A. § 40-20-116(a). This section contemplates restitution to the victim of the property itself or the value of the property. Code section 40-35-304 additionally allows restitution for the victim's "pecuniary loss," consisting of special damages and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the crime" when restitution is ordered as a condition of probation. *Id.* § 40-35-304(e)(2). We have held that " in theft cases not involving restitution as a condition of probation, section 40-20-116(a) restitution may not exceed either the value assessed by the jury or the theft-value range reflected in the jury's verdict." *State v. Patricia White and Craig White*, No. W2003-00751-CCA-R3-CD, slip op. at 25 (Tenn. Crim. App., Jackson, Oct. 15, 2004).

Ms. Maners testified that she and her husband had lost more than $100,000 in property in the six months preceding August 20, 2012. She admitted, however, that she

could only say with certainty that the property taken by the defendant and co-defendant on August 20, 2012, was that property which, with the exception of some pipes, was returned to her by Dudley's recycling. She stated that the value of that property was "over $6500" and that $5,929.22 in materials was returned by the recycling company. Ms. Long, the manager of the recycling company, testified that the defendant and co-defendant brought the large "gang box," a small amount of metal, and "no more than six" pipes to the recycling company. All the materials, save the pipes, were returned to the victims. The trial court accredited Ms. Maners's testimony that the value of the items recovered was $5,929.22 and, in grading the theft offense, determined that the value of the property taken was more than $1,000 but less than $10,000. The trial court did not, however, determine the exact amount of the property taken.

At the sentencing hearing, Ms. Maners asked the trial court for $10,000 in restitution. The trial court concluded that Ms. Maners and her family "have suffered at least a $10,000 loss of property" and ordered the defendant to pay $5,000 in restitution. The trial court did not, however, make a factual determination as to the precise value of the property taken from the victim only on August 20, 2012. Moreover, the trial court failed to take into account the value of the property that was restored to the victim as required by Code section 40-20-116(a).

In consequence, the case must be remanded for a new hearing on the amount of restitution to be awarded. At the hearing upon remand, the trial court must make a factual determination from the record of the value of the property taken by the defendant on August 20, 2012, and must subtract from that amount the value of the property restored to the victims. *See id.* § 40-20-116(a).

Accordingly, the length and manner of service of the sentence are affirmed, but the case is remanded for a new hearing on the amount of restitution to be paid by the defendant.

_____
JAMES CURWOOD WITT, JR., JUDGE

-7-